DURWARD B. KENNEDY, complainant-appellant,

*v.*

ADELA J. SMITH and ALMA L. SMITH, defendants-respondents.

[Decided November 20th, 1922.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Backes, who rendered the following opinion:

"I do not think that further consideration will change the views I entertain and the conclusion I have reached. The bill is filed to recover so-called secret profits alleged to have been made by the defendants while acting as agents for the complainant in the sale of his property.

"In 1910 or 1911 the defendants, the Smith sisters, owned the tract of land upon which the Smith academy, in Passaic, was later erected. They had some money—very little—that went into the building. Their brother-in-law, Kennedy, the complainant, advanced them sufficient to complete it—$31,196.68. To secure him the Smith sisters made an absolute conveyance of the land to him, and he, either contemporaneously with the execution of the deed, or shortly afterwards, gave them a declaration whereby he agreed to convey to them the property if they repaid in installments as set out in the agreement, the money he had advanced, and interest, and the carrying charges of the real estate, taxes, assessments, &c. None of the principal has been repaid. The interest was paid up to 1916. The first few years of the operation of the academy by the Smith sisters were not prosperous, but the receipts were sufficient, at least, to hold down the carrying charges. They had had an established business in a nearby place—the Passaic club—and had taken it from

there to their new building. The war came on and entertainments such as they carried on fell off, and they had quite a struggle to keep afloat. When I speak of the period of the war I mean from the time the Germans started in 1914. During the war entertainments were intermittent, and the business was carried on at a loss. It revived to some extent after the boys came back. The complainant and defendants were intimately friendly when the complainant advanced the money. He had their prosperity at heart, and they were properly appreciative of what he was doing for them, but, withal, while he advanced the money he was also careful to see to it that he was assured of its return with six per cent. interest. He was not a benefactor without a sense of self-preservation. So long as the Smith sisters were able to pay the interest he was apparently content, and their relations, while not perhaps as cordial as they had been when he loaned the money, continued friendly enough until his 'dear' sisters stopped paying in 1916. From then on he was insistent for his money, and they were unable to pay—not even the interest. By 1919 or 1920 their friendship had come to an end—decidedly. The feeling between them was the very antithesis of the spirit of 1911, and was marked by Kennedy's bringing an action to eject them from the academy, and a suit to foreclose the mortgage on their home. Judgment was entered in the ejectment suit, and pending an appeal to the court of errors and appeals he filed a bill in this court for the appointment of a receiver. I speak of these things simply to show that there was no love and affection between them, and whatever of confidence there had been had vanished. I think nothing emphasizes this better than the foreclosure of the mortgage on their home. Now, it was while the parties were in that antagonistic mood that Mr. and Mrs. Drosness came on the scene. They wanted a business such as the Smith sisters had, and in Passaic, and they made them an offer of $42,000—$27,000 for the building and $15,000 for the equipment of the academy—the fixtures and appliances—and good-will. Kennedy had no interest or lien on the equipment. While the negotiations were carried on on the

basis of $42,000 for the entire plant, the offer was made and entertained as so much for the building and so much for the business, and the figures were as I have just given them. The Smiths submitted the offer of $27,000 to Kennedy, and he said, using his own language, 'Nothing doing.' He says that immediately Miss Alma Smith raised the figure to $30,000. I doubt that the raise was at that time. I think, and the indications are, it was in a later talk over the 'phone; but be that as it may, Kennedy expressed a willingness to take his principal, $31,196.68, after the offer was raised from $27,000 to $30,000. The raise was not by the Drosnesses. All they would give was $42,000 for the place, and they were not interested in its distribution. The Smith sisters raised the figure to $30,000, and they eventually met his demand of $31,196.68 by offering to pay the additional $1,196.68 out of their own clothes to get the deal over with the Drosnesses. Kennedy was to get the principal he had advanced and forego his interest for 1916. Kennedy says he was suspicious that they were getting more than $30,000. I think he knew they were, for he knew they had valuable paraphernalia and that it went with the sale. He says he put them on their honor that $30.000 was all they were getting and that they abused his confidence. There was no trust or confidence in fact—that is plain enough. He placed no trust and he had no confidence in them. His conduct, his demeanor, his letters, all indicate that he had no faith in them, did not trust, and did not confide in them. If there was no confidence reposed, in fact, I fail to see how, in the circumstances, a trust relation can be raised in law. Kennedy was awake to the fact that they were selling out and that they were driving a bargain with him for the least he would take. The fact that they offered to pay Kennedy $1,196.68 out of their own pockets to meet his demand, shows to my mind that he understood that they were dealing with him, not acting for him.

"Putting them on honor did not create a relation of trust and confidence. Not in this case, where the parties were at daggers' points and ready to chew each other up, figura-

tively speaking. The negotiations with the Drosnesses were pressing and had to be closed, and Kennedy was holding out. Now, whatever Kennedy may have thought about agency or confidential relationship before Sunday, November 6th, he must have been completely disillusioned by what then occurred. That Sunday afternoon the Smiths and their lawyer, Mr. Foulds, met, by appointment, Mr. Heine, Kennedy's counsel. Prior to that time Mr. Heine and Mr. Foulds had been trying for a settlement. They were both tired of the long drawn-out litigation. At that meeting the Smith's presented an agreement for Kennedy's signature, that he sell to them or their appointees, I do not recall which, the academy property for $31,196.68. They refused to tell Mr. Heine from whom they had the offer, or what the offer was. They claimed that on previous occasions Kennedy had mixed in and destroyed their prospects. They said to him, in effect, 'We will give Kennedy $31,196.68; we will not tell who the purchaser is, nor how much we are getting. It is none of your affairs. We make no representations of any kind. Here is the contract. Sign it for your client or let it alone. If you do not sell, well and good, we will quit, and you may take the building under your judgment.' They say they had in mind to remove the paraphernalia, I think. back to their old stand, the Passaic club. Mr. Heine, not willing to assume the responsibility, talked with his client over the phone, and the proposition was put up to Kennedy, as it had been put up to Mr. Heine, by one of the Smith sisters or Mr. Heine, or possibly by both, substantially in the words I have just given, and Mr. Kennedy directed his counsel to take the offer, and, under instructions, Mr. Heine executed the contract. Counsel says, procured under pressure! Well, maybe so, but certainly that cannot be said of the one Mr. Kennedy executed later, for a duplicate was sent to him and he signed it later in the week. He had plenty of time to reflect. Yes! There may have been agency in the sense that the Smiths were conducting the sale of Kennedy's property, but not as brokers for Kennedy, and assuredly there was no relation of trust and confidence, or any evidence of

breach of faith or honor. They stood at arms' length—antagonistic. I fail to see any concealment in the statement to Kennedy that they would make no representation, that they would not tell who the purchaser was, or how much they were getting. They revealed to him that they were concealing from him certain facts and they gave him, frankly, information of their attitude. He·had his choice. He did not have to sell. And with a full realization and appreciation of their attitude he made the bargain, and later on it was carried out by the Smiths with the Drosnesses, and Mr. Kennedy joined in the deed and got his money.

"Now, let us look further to see whether the Smith sisters, assuming they were made the agents of Kennedy in the sale of this property, made a secret profit. The law is well settled that an agent cannot make a secret profit and retain it against the claim of his principal. The law jealously guards any relation of trust and confidence. The party in whom the confidence is reposed must discharge his duty zealously and with the utmost fidelity. Suppose, I say, we take the view that the complainant had made out his claim that the Smith sisters were his agents. Is there any evidence that they made a profit? Is there anything to show that the Smith academy was worth more than $30,000, or that $12,000 is more than the value of their equipment, their paraphernalia? We must not overlook the fact that the purchasers appraised the academy at $27,000. I cannot agree with counsel's argument that Mr. Kennedy, when informed by the Smiths that they had a purchaser for Smiths' academy, understood and believed that he was to get whatever the purchaser paid for the academy as it stood, equipment and all. He had no lien upon the personal property, as I have said, and he, of course, had no rights to the proceeds, and I am quite satisfied that he did not believe he was entitled to, or was to receive, any part of it. The testimony is that the equipment was worth $10,500 plus. That is the value placed on it by Miss Adella Smith, a competent judge, *albeit* her judgment may be biased. She says that was the market value of the property that they turned over to the Drosnesses. There is no testi-

mony to refute it—none to show that it was worth less. There was a witness from the Spaulding company who informed us of what we all know, that articles of this kind depreciate from use, and who also told us that sporting goods articles have increased over ante-war prices fifty to sixty per cent., so that the depreciation is more than counterbalanced by the advance in cost. But, be that as it may, there is the testimony, and the only testimony in the case, that the things were worth $10,500. That leaves but $1,500 for the good-will, which was an important factor in the sale. The Smiths have been for years engaged in the enterprise and have an established business and an enviable reputation in Passaic as entertainers. Before the Smith academy was built they carried on, for some ten years, at the nearby Passaic club. Their clientele, built up year by year, until thrown out of joint by the war, was renewed after the war, and was of the best. At any rate, the purchaser regarded the good-will as an asset of considerable value. My opinion is that $12,000 was but a fair price for the tangible personal property and the good-will of this going concern, crippled as it was. There is nothing in evidence contrary.

"The complainant has failed to make out his case and the bill will be dismissed."

*Messrs. Heine, Bostwick & Bradner,* for the complainant-appellant.

*Mr. Andrew Foulds, Jr.,* for the defendants-respondents.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion rendered in the court below by Vice-Chancellor Backes.

*For affirmance* — THE CHIEF-JUSTICE, SWAYZE, TRENCHARD, BERGEN, MINTURN, KALISCH, BLACK, KATZENBACH, WHITE, WILLIAMS, ACKERSON, GARDNER, VAN BUSKIRK— 13.

*For reversal*—None.